Good morning, Your Honors. May it please the Court, Diana Bartys from Mooney, Green, Sandin, Murphy & Welch, and at Council Table is Jack Mooney of the same firm. We're here on behalf of the United Mine Workers of America 1992 Benefit Plan. This Court should apply the standard established by the Supreme Court in Metamune v. Genentech because the action brought by the 1992 plan was under the Declaratory Judgment Act in order to avoid imminent injury. The imminent injury caused by CONSOL's changes to its Individual Employer Plan is real and actual, and that's by operation of the COAL Act. The COAL Act provides lifetime health care benefits for certain retired coal miners and their dependents. CONSOL is required under Section 9711 of the COAL Act to provide an Individual Employer Plan, and it provides that plan as a signatory operator under definition of the Act. Pursuant to Section 9711 as well, CONSOL must provide benefits at a specific level to a certain specific group of retirees and their dependents. In July 2016, CONSOL announced changes to its Individual Employer Plan that became effective in October 2016 and some additional changes in January 2017. These changes changed the required level of benefits that were to be provided to the retirees and dependents, and it also restricted eligibility to the defined set of retirees and dependents. Pursuant to the COAL Act where a retiree or dependent does not receive the required level of coverage from their last signatory operator, the 1992 plan must step in and provide those benefits. Let me ask you, is there any claimant who has made a claim that they're not receiving the insurance benefits that they're entitled to? At the time we filed the complaint and through the briefing, no, Your Honor. And up to this point, I am not aware that the 1992 plan has received any claims. We believe this is because, as CONSOL pointed out in its briefing, that it is we don't believe that CONSOL can avoid a finding of standing here, a finding of imminent injury, by simply fixing problems as they come up. In our view, the injury is imminent because at any time CONSOL could fully affect the changes that it announced in 2016. And when those changes are affected, the retirees and their dependents will not receive the required level of care. So are you saying that even though they've made these changes, they're not really implementing them at this time? Is that in the record? It is in the record that it is CONSOL's position that any complaints that have come up have been resolved to the participant's satisfaction. Before the district court, we provided a number of examples of retirees who had complained to the 1992 plan regarding the increase in costs, regarding the change in the provider and pharmacy networks, and regarding eligibility issues. And although CONSOL addressed those in its briefing as well, the district court ultimately did not determine whether... Do you allege that anybody's out any money because of this? Or that their care... I mean, I don't recall any allegations in your complaint that minor X has to pay more than they had to pay before, or they sought a certain service and they weren't entitled to get it. If you had those allegations in your complaint, then I think it's a different story. But I don't recall anything like that. You're correct, Your Honor, that we didn't plead anything like that in the complaint because we brought this action under the Declaratory Judgment Act. The retirees and their dependents in the 1992 plan doesn't have to actually incur the injury in order to have standing to bring this case. We have standing under the Declaratory Judgment Act because, as the Supreme Court stated in MedImmune, a plaintiff isn't required to bet the farm or burn down the building in order to have standing. And if you let me play out what would have happened if the 1992 plan had enrolled all of Consul's announced changes, you'll understand why we undertook a declaratory judgment versus waiting. If the 1992 plan had enrolled all 2,300 beneficiaries and their dependents at the time of the announced changes, the 1992 plan would have had to move those retirees from Consul's IEP to the 1992 plan, causing a disruption in the administration of their benefits, would have had to start paying for those benefits, and the 1992 plan would have pulled the security interest that Consul had been required to post under the COLE Act. At that point, we would have ended up in litigation, and if the district court had found against us, had declared that Consul's changes were permitted under the statute, and if this court decided the same on appeal, then the 1992 plan would have to sit everybody back to their original starting positions. The 1992 plan would yet again have to move those beneficiaries back from the 1992 plan to Consul's IEP. The 1992 plan would have been out all of those benefits that it had paid without any recourse to receive any sort of monetary recovery for the money that it would have expended, and Consul surely would have claimed that the bond had been improperly pulled, and that would have had to be rectified as well. Well, that's one extreme example, I suppose, but why isn't the more reasonable, probable situation is a beneficiary doesn't get his situation resolved to his or her satisfaction, and then comes to you, and at that point you've got a plaintiff. Certainly at that point, we would have a plaintiff and a case. From our perspective, and I don't want to speak for Consul, but I believe Mr. Woodrum will take the position that no one can bring a claim for a violation of Section 9711 as a matter of statutory standing, but leaving aside that matter, while that scenario, Your Honor, would provide standing in our opinion, it's not the only way to achieve standing in this case, and the Supreme Court is replete with examples of imminent injury, and we've shown that both through the Declaratory Judgment Act and MedImmune, but we've also shown that we have a statutory injury here that is concrete and particularized. We've also shown imminent economic injury in related to how the 1992 plan is going to have to step in and provide those benefits once that complaint comes in the door. If I could turn to the statutory injury, unlike the plaintiff in, say, Spokio, where they weren't able to prove a concrete injury, here we've proven both a statutory injury that is concrete and particularized. But the statutory injury would be the injury to the beneficiary, not to the plan. I don't believe that's accurate, Your Honor. I think it's both to the beneficiary and the plan. Congress specifically designed the COLE Act so that last signatory operators, employers had to, the intent was that employers had to pay for their own people and had to administer their plans for their own people. The design of the COLE Act was such that to avoid the problems that previous health care plans, retiree health care plans, had faced, which was employers, similar to Consul here, making changes or dumping its retirees into the backup plan. So that's what Congress was trying to do, avoid last signatory operators from avoiding their own obligations and dumping those retirees into an entity like the 1992 plan. So when we look at it that way, the definition of the harm, of course, goes to the beneficiaries as well. But the definition of the harm that Congress was trying to protect was the situation where a last signatory operator wasn't paying for their own retirees, but the 1992 plan was. But if there's no injury to a beneficiary, what's the injury to the plan? How are you out anything if there's no injury to a beneficiary? We believe there has been injuries to beneficiaries here because whether or not Consul is fixing these situations as they come off on a one-off, or if a beneficiary is driving the extra hour to get to his pharmacy, paying the increased out-of-pocket costs, you shouldn't have to labor under those changes when the COLE Act requires the level of coverage that it does. But you have no allegation that any of those things have occurred? You're correct, Your Honor, that we have no specific named individual who has complained of those issues. But Consul announced its changes, causing significant disruption in the COLE fields, calls coming to the 1992 plan, people trying to figure out their coverage, and that injury has resulted in the 1992 plan having imminent economic injury in that it will have to step in to provide those benefits where Consul isn't. This is not a case where there's an attenuated chain of circumstances that a number of dominoes need to fall before the 1992 plan will have the actual injury. This isn't like Lujan, where plaintiffs had a future plan to visit and observe wildlife, but there were no concrete plans, and they wouldn't be able to prove that their actual, that if they went and visited abroad to go observe wildlife, that the statute at issue actually would have caused them not to be able to have that experience. Here, we're one step away, which is the 1992 plan having to provide coverage to either the entirety of the population, or a single beneficiary that's either been restricted from eligibility whatsoever as a result of Consul's redefinition of eligibility under the statute, or having to pay for those benefits. The action is not hypothetical or conjectural. Consul has conceded that it's made these changes and that it will not provide benefits to these after-acquired types of beneficiaries, and the 1992 plan should not be required to wait for that to happen in order to bring this case, because the case law is clear where there is imminent risk, where there's a substantial risk, and that's what we have here. We can bring the claim now. Turning to the Consul's argument regarding ripeness that it's raised, similarly, we argue here that this is a legal question. It was a legal question for the District Court about whether or not Consul's changes were appropriate under the COLE Act. Similar to the standing analysis, there was no uncertainties there that would lead to this case being unripe. In that case, it was simply for the District Court to make a judicial determination. The District Court addressed ripeness. It did not. The District Court simply looked at the injury in fact analysis and found that the 1992 plan did not have injury in fact. Consul has raised that as an alternative for this Court to view, given that it was fully briefed before the District Court. Let me also turn to the concept of concrete and particularized harm, which would be necessary in really any of the tests that would be applied here. Unlike cases where the injury was not found to be concrete, here we're talking about a specified set of retirees, a specified definition for an after-acquired eligible beneficiary, and we're talking about a set level of benefits, which we know what is. As a result, the harm here is concrete. It's also particularized because the 1992 plan is the only entity that is required to serve as the backstop. As a result, the harm is particularized. Unless your honors have any additional questions, the 1992 plan's position is that we have proven that we have standing either through a meta-immune analysis under the Declaratory Judgment Act. We have it through proving imminent economic injury. We have it through proving the statutory harm as the intent that Congress put into the COLE Act was to ensure that employers like Consul can't avoid their own obligations, and that injury flows down to the 1992 plan. For those reasons, we ask this Court to remand this case back to the District Court with a finding that this case is both ripe and the 1992 plan has standing, and order it to find an adjudication on the merits. Thank you. Thank you. Mr. Woodrum. Your Honor, John Woodrum for Appellate Consolidation Energy. It's important to believe and I think you'll agree that the plan in this situation has no standing to bring this case. The COLE Act imposed obligations on employers such as Consul to establish a plan or to continue a plan of the type that was in effect prior to the COLE Act. Section 9712 of the COLE Act separately imposes an obligation on the appellants, the 1992 plan, to create their plan. They have a plan and they have thousands of people in their plan, and they provide benefits to those people under their plan document in the same way that Consul Energy has for the past 20 plus years provided benefits to tens of thousands of beneficiaries in its plan. The plan's concern here is not that they're about to incur harm. The plan's case here is really about trying to enforce Section 9711 of the Act, which is the statutory provision that details, not much detail really, it just says that an operator subject to this section must have a benefit plan that provides substantially the same level of benefits that it provided before the Act. So that's our obligation. There are no crisp criteria. Our benefits are to be substantially the same as had previously been provided. What the plan is attempting to do here, and it's replete throughout their complaint and their briefing, is they don't like Consul's new plan. They don't like, for example, as demonstrated in the affidavits of Mr. Chisholm from the plan, they don't like the fact that in the new plan, having withdrawn from the Bituminous Co-operators Association, Consul decided to not use that plan anymore and to have its own Consul plan. But the Consul plan doesn't provide, as did the prior plan, a right to the 1992 plan to be the final arbiter of disputes under the plan. They object to a number of things that really have nothing to do with the beneficiaries, and moreover, the changes that Consul made primarily have to do with utilization of providers who are not in the network. So the plan has is we don't think that what you're doing is really consistent with this broad statement in the COAC that your plan has to maintain substantially the same level of benefits. I thought what Ms. Bartas was saying was something different, not that, well, I assume maybe it's true that they don't like the plan, but not only don't we like it, but what you're doing is to provide that coverage. You're right, Judge Giaz, but that is, they haven't shown that they're going to need to do that. There have been no complaints that they've identified throughout the summary judgment process that anyone has complained. If somebody is disadvantaged, if Consul did something wrong that's not in compliance with its obligations under 9711, the beneficiaries have every right through several mechanisms to challenge that. First of all, they can appeal under the plan, which is an ERISA plan. And secondly, if they don't like that, they can go into federal court and say this plan, this benefit that you denied me is a benefit that I'm supposed to have under the COAC. So the harm to the plan is, as Judge Johnston found, very speculative. Which part are we supposed to litigate before Judge Johnston? The part about not letting them be the final arbiter of the case? How does that matter? And when you go through the allegations that the plan has made as to why they might have to step in, you can see that they're all very speculative. What about the change with respect to the spouses? Those people who, after the date, who marry after that date won't be covered as surviving spouses. Is that speculative? In the same way that, first of all, this is a very elderly group. 90% are Medicare eligible and they've all been retired for at least 20 years. You had to be retired before 1994 even to get into the plan in the first place. And your point is they don't deserve to get married again? No, Your Honor. Our point is that the statute is not clear on who is eligible. Clearly, the minor is eligible. And if somebody is denied benefits, then... They will be denied. You've already said that is the result. After that effective date, if you get married, you're not going to be until someone gets hit, who's standing in the middle of the road gets hit. We said, look, now is the time to get the person to move out of the road and, therefore, get the law straight before the train wreck happens or the accident happens. You're going to deny that class of people after that date who marry, as you say, old people, I guess you're trying to say. But be careful about the chief who's getting old, too. So is the attorney at the DS, Your Honor. What I'm saying is that that's a class of people. Right now, that's not speculative at all. That is a defined class that's going to be eliminated by what you've done now and you're going to do it. Why not have declaratory judgment? Because, Judge Gregory, that is... Is there going to be such a person? Certainly, there's going to be somebody. Love springs eternal all the time. You know that. We're a nation of lovers in the presence of anyone who might be in that position. It doesn't have to be in the evidence of anyone. For example, you think about this. You impact person's lives. This is hypothetical, but it's probably true. You know how many people who don't get married sometimes because, well, if we get married, I'm going to lose this benefit here, so I guess we'll have to... You're making life decisions on it. That's real. In other words, we would get married, but whatever. I can't... Those things are real. Why don't we settle them in declaratory judgment? That's the whole... That's the hybrid of declaratory judgment. It's a lot legal, but it's a little equitable, too, because we don't... We soften those edges of defined damages because we know in here, you have done that, correct? You've set the date, and there's a class of people, and you're saying until somebody gets married and is denied, we have to wait to see whether or not that was appropriate? Well, we have to see what the facts of that situation are with respect to the plan. It may well be that they would be denied benefits, but I... Well, they will be denied. In other words, they marry after that date, and the person dies, and their otherwise surviving spouse, they're not covered. What's the problem? It's case settled. That's why declaratory judgment says, no, did you wrongly do that, and that person, the plan is to pick that person up, and that is a direct impact on them, and that's what the whole idea... The people work in years and mines. It's one of the most dangerous occupations in the country. The whole idea is to protect and to have coverage and plans, not to wait for train wrecks to happen, but we know that you've put in place a class of people who will not be covered. That's not speculative at all. That's what the purpose of declaratory judgment, and particularly on this larger social issue, and policy for a group of people who work in the mines and need to be covered in their family. In response, your honor, I simply say that there's just no evidence that there's a likelihood that this will happen, and if it were to happen, then that individual would have a right to challenge that under that person's denial of benefits, and if they instead go to the 1992 plan, and the plan enrolls them, which might be the scenario that would happen, the plan charges us a premium for them. The plan provides their benefits. So where's the imminent harm that the plan is going to have, even in that situation? That's the point. The act is very comprehensive in that regard. I have two responses. First, that's just speculation on the plans part, the 1992 plans part, that Console was resolving disputes. That's the whole purpose of the administrative process, is to resolve those disputes. As long as the disputes get resolved, the 1992 plan doesn't have any cost. It can't even make a claim that the person needs to be enrolled, because the person hasn't come to them. So there's no loss to them, notwithstanding their speculation that somehow Console would really just I don't think the 1992 plan would hesitate, if someone were to be enrolled, to bring the case again. So that is So in that circumstance, would you be arguing that they did not have standing when there was an actual claimant that they had enrolled? No, Your Honor, we don't argue that. We don't argue that. I don't know why. I know that's not the factual situation at this point, but it sort of seemed like the corollary to your argument that you would argue in that circumstance that they didn't have standing. No, we wouldn't argue they lacked standing. We might argue, we might have other defenses to that. We might say, well, you shouldn't have enrolled them, because the benefits we're providing are the benefits we're required to provide. That's a merits-based defense, correct? That becomes a defense, yes. So when Ms. Bartas said that what they wanted to avoid was having to enroll all of these beneficiaries wholesale, I think that's what she said, that they'd have to put them all under the plan, they don't have to do that. Well, it's preposterous. Not to pull a punch, it's just preposterous. We've provided benefits to people, as we are required to do, since the beginning. If we cut everybody off, that does happen, Your Honor, because we've seen bankruptcies in the coal industry where the employers who provide the benefits and all the related persons who are jointly liable for that financially go under and can't provide them. That's when the plan steps in. That's what 9712C is about. When these people lose their benefits, this plan picks them up. That's not what the plan's doing here. The plan here is trying to take on the role of a private attorney general as the representative of the beneficiaries who themselves have not made claims or been denied benefits, and they want to come in and say, we want to tell CONSOL what it's supposed to do under section 9711. That is not a role that Congress assigned to them. There is no place in the statute that gives them that authority, and they don't have standing to come in and try to do a review of our plan because they don't have that right. They are also not the representative of the beneficiaries, of our beneficiaries. They're the representative of their beneficiaries, of course, but that's the dilemma that we have is they're trying to drag us in front of the district court to litigate all the provisions of our plan, and most of the provision, in fact, virtually all of the provisions that they complained about in their affidavits are just speculation. They're not based on anybody actually coming to the plan and all the provisions of our plan, and that is not their role. If a beneficiary has that problem, there are multiple avenues available to the beneficiary. I have more time, but I really don't have more to say simply because this case shouldn't, the district court was correct in finding that the harm that speculative. If it occurs, it can be addressed, but at this point in time, it would be a morass for the district court to try to even get involved in adjudicating all the different provisions in our plan and whether they're substantially the same as the law requires them to be when there is no evidence that anybody is complaining except the 1992 plan. Thank you. Thank you, counsel. All right. The 1992 plan is not trying to be the final arbiter of whether or not the changes that consul made are permitted or not. That's why we went to the district court. I thought so, too. We want to be the sole determinants because we thought a court of law would do that. Go ahead. Exactly, your honor. We believe that the changes are in violation of the statute, and we have a substantial concern, which is based on a substantial risk that we're going to have to step in and provide the benefits if and when it's determined that consul is not providing them at the required levels. Now, the statute provides a mechanism by which employers like consul that have an IEP can make changes to that IEP. Consul didn't use those statutory provisions here. It's important to keep that in mind. Consul has made changes to its plan in the past, and it's used those statutory provisions to make those changes, to make managed care changes, to make cost-saving changes. Those are permitted by the statute when you follow the appropriate procedure. Consul didn't do that here. If it had done that, then yes, other entities may have been involved in the process in determining whether the changes were going to be substantially or similar or not. For instance, one of the provisions allows for the appointment of a medical review board that is agreed on with United Mine Workers of America, the union, and they come to these changes. And if that process had been followed, we would be in a very different position here. But because consul unilaterally made these changes, we took what we thought was the most prudent and efficient action. So why would you be in a different position if the result ultimately was the same? Are you saying the result might have been different? The result might have been different, Your Honor. And if they had used, because it would have required approval of the United Mine Workers of America, another entity that obviously has an interest. See, that's the odd thing about this case. Why aren't they involved? It strikes me as odd. It's been almost two years. They don't have a claim. The Mine Workers Association isn't complaining, at least not publicly. I don't understand this. You would think that someone would be squawking or complaining about this. Your Honor, the union has been complaining. This is an issue for the union. It's obviously an issue for the 1992 plan. The reason why the 1992 plan is before you is because we're the entity with the particularized injury that would give rise to standing here. Well, you're one of them. Beneficiaries seem to me to be the most directly affected. Yes. And I also wanted to touch on the point you made, Judge Gregory, about the impact on real people's lives. And the example that you gave was decisions that people might make on getting married. The unfortunate truth in this case is where a large part of our concern lies has to do with the opioid crisis. So if a grandchild becomes a dependent of a grandparent, they're covered by the 1992 plan. So similarly, where we're seeing in society today a number of grandchildren being taken care of by their grandparents, we're expecting claims to arise in that regard. And again, people will be making decisions. Who should be caring for this child if their parent can't? Is it an aunt, an uncle? Is it the grandparent? Because that child's going to have health care. West Virginia, one of the hardest hit states, the capital of the opioid crisis. It is, Your Honor. And that's why this is a real concern. And this is a real population. This is not speculative. When these after-acquired beneficiaries come, they need to have that coverage provided. Finally, CONSOL suggested that if someone was denied coverage, they could appeal through CONSOL's claim process. But that's going to be under CONSOL's new plan, which doesn't provide the coverage for those after-acquired beneficiaries. And states all of the changes within it. So if you're applying through a grievance process through your plan that's already predisposed against you, you have very little chance of prevailing in that. Then Mr. Woodrum said, if that didn't work out, they would go to the 1992 plan and ask for benefits. And then the 1992 plan would enroll the participant, and then CONSOL would pay the premium. I don't think it's that simple. If CONSOL's taking the position that it was allowed to make those changes, it would take the position that the 1992 plan never should have enrolled the participant, and I don't think that they would pay the premium. So I think you need to look at all of this in terms of the context of its changes. It announced these changes. It put them into effect. The fact that we don't have an actual individual shouldn't matter as to whether we've shown the imminent risk that we need to have standing here. Thank you. Thank you, CONSOL. We'll come down and greet CONSOL and then proceed to our final case for the morning.
judges: Roger L. Gregory, G. Steven Agee, Albert Diaz